DMP:JAM/JGH
F. #2020R00001

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | C O M P L A I N T |
| - against - | (18 U.S.C. § 922(k)) |
| DANIEL JOU and<br>JOSEPH MINER, | 20-M-368 |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

NATHAN RUDNICK, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

**Unlawful Possession of a Firearm by Daniel Jou**

Upon information and belief, on or about May 12, 2020, within the Eastern District of New York, the defendant DANIEL JOU did knowingly and intentionally possess and receive a firearm, to wit: a Glock 19 model 9 millimeter handgun, which firearm had the manufacturer's serial number removed, obliterated and altered and which had been shipped and transported in interstate and foreign commerce.

(Title 18, United States Code, Section 922(k))

## Unlawful Possession of Firearms by Joseph Miner

Upon information and belief, on or about May 12, 2020, within the Eastern District of New York, the defendant JOSEPH MINER did knowingly and intentionally possess and receive firearms, to wit: a Mossberg 500 shotgun and an M&P Shield model 9 millimeter handgun, which firearms had the manufacturer's serial numbers removed, obliterated and altered and which had been shipped and transported in interstate and foreign commerce.

(Title 18, United States Code, Section 922(k))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to the New York Joint Terrorism Task Force ("JTTF"), and have been assigned to the JTTF since October 2019.  As a Special Agent, I have investigated numerous matters during the course of which I have conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants, and used other investigative techniques to secure relevant information.  I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the

---

[1] Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest, I have not set forth every fact learned during the course of this investigation.  At various points in this affidavit, I will offer my interpretations of certain communications.  My interpretations are based on my knowledge of the investigation to date and review of prior communications, the contents and context of the communications, prior and subsequent communications, conversations with officers, and my experience and familiarity with terrorist organizations generally.  Summaries of communications do not include references to all the topics covered during the course of the communications.  In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned.  While transcribers have attempted to transcribe conversations accurately, to the extent that quotations from these communications are included, these are preliminary, not final, transcriptions.

defendants' criminal history record; and from reports of other law enforcement officers involved in the investigation.

2.  In the course of an investigation by the JTTF, the defendants DANIEL JOU ("JOU") and JOSEPH MINER ("MINER") each bought and received one or more firearms with obliterated serial numbers from an undercover law enforcement officer.

## THE FIREARMS PURCHASES

3.  On or about April 12, 2020, Miner initiated contact with an undercover law enforcement officer ("UC-1") posing as a firearms dealer. Miner had previously expressed interest in purchasing four handguns and a shotgun for himself and JOU. Specifically, MINER listed the guns that he and JOU wanted to purchase as follows:

> M92 f s; Sprgfld 9 1 1,gl0ck 1 9,
> S and W Shi3ld 2.o ; M0ssb3rg 500

4.  Based on my knowledge, training and experience, and other facts obtained during the course of this investigation, I believe that MINER used coded language to describe the guns he and JOU sought to purchase as follows: the "M92 f s" refers to an M92 Beretta Pistol; the "Sprgfld 9 1 1" refers to a Springfield 911 model handgun; the "gl0ck 1 9" refers to a Glock 19 handgun; the "S and W Shi3ld 2.o" refers to a Smith and Wesson Shield handgun; and the "M0ssb3rg 500" refers to a Mossberg 500 shotgun.

5.  During their April 12, 2020 text exchange, MINER wrote to UC-1 "Its Joe, just checking in on the supplies. Thanks." UC-1 responded that he/she would try to call MINER the next evening, to which MINER responded, "Sounds good Thanks."

6.  The next night, on or about April 13, 2020, UC-1 called MINER. During the call, which was recorded, MINER and UC-1, using coded language, discussed

MINER's desire to purchase multiple firearms for himself and on behalf of JOU, whom MINER described to UC-1 as his "neighbor/friend." Specifically, MINER asked UC-1 if he/she had received MINER's list of "five tools mentioned," a reference to the list of five firearms that MINER had previously expressed interest in purchasing for himself and JOU. Based on my knowledge, training and experience, as well as the context of this case, I believe that MINER used the coded language "tools" to refer to firearms during the phone call with UC-1.

7. During the April 13, 2020 call with UC-1, MINER stated that the first three items on the list of guns – meaning the M92 Beretta pistol, Springfield 911 handgun and Glock 19 handgun – were for JOU. MINER stated that the remaining two items on the list – the Smith and Wesson Shield handgun and the Mossberg 500 shotgun – were for him. MINER further stated that he and JOU had the money ready to purchase the "tools" and were also "both completely good, like we're good on bank," meaning they had the money to purchase the guns.

8. MINER and UC-1 then discussed plans to meet in the ensuing weeks. When UC-1 asked how urgent MINER's request was, MINER stated that he did not need the guns immediately and was willing to wait up to a month, but "the sooner the better." MINER also stated that JOU had been "nagging" MINER for the guns, but that "if he has to wait, he has to wait . . . it is what it is." UC-1 told MINER that he/she could likely meet MINER and JOU in the New York City area in a few weeks to talk more about the purchase. MINER asked UC-1, "Do you think you'll have the tools there, then?" UC-1 responded that he/she would have of the some items with him/her and "some other stuff too" so that MINER and JOU could decide what they wanted to purchase. MINER responded, "Sure, absolutely."

9. On or about April 22, 2020, UC-1 texted MINER and asked if MINER was available to talk by phone later that evening. MINER responded, "Call me then. Thatd be perfect." That night, MINER and UC-1 spoke briefly by phone. The call was recorded. During the call, MINER and UC-1 agreed to meet in Queens, New York on April 26, 2020. MINER stated that JOU would also join for the meeting. MINER stated, "I'll be looking forward to it."

10. On or about April 26, 2020, UC-1 met with JOU and MINER inside a hotel in Queens, New York. The meeting was audio and video recorded.

11. During the meeting, JOU stated that he wanted to buy an M92 Beretta pistol, Springfield handgun and Glock 19 handgun. When UC-1 asked JOU whether he wanted the Springfield firearm in the 9 millimeter or .40 caliber version, JOU responded that he wanted the 9 millimeter version now but ultimately wanted to purchase both versions.

12. MINER stated he wanted to purchase a Smith and Wesson Shield handgun and a Mossberg 500 shotgun.

13. MINER stated that he was ready to purchase guns that day and had $2,000 with him as well as a bag with clothes to transport the guns. JOU indicated that he was prepared to spend at least $3,000 to spend on guns.

14. During the meeting, when asked if they were interested in purchasing anything else, both JOU and MINER also expressed interest in purchasing an AR-15 style assault rifle ("AR-15"). UC-1 stated that he/she had two different models of assault rifles available for sale: a Colt M4 and a "Ghost AR with a suppressor" as well as 100 and 50 round magazines. Based on my knowledge, training and experience, I know that a "ghost gun" refers to a firearm made by an individual using different gun parts and which has no serial

numbers or other identifying markings, and that a "suppressor" refers to a silencer.  Later in the meeting, MINER stated that an AR-15 with a suppressor "would be cool."

15.    During the meeting, MINER asked UC-1 whether UC-1 sold ammunition.  UC-1 responded that he/she did not typically deliver ammunition with guns because "everything's liability for me" and that UC-1 "gotta be very careful" because "it's not like a gun store, cause a lot of the serial numbers, we got them cleaned off."  MINER responded, "Yeah."

16.    Shortly thereafter, MINER suggested using JOU's driveway as a possible location to conduct the gun sale, describing it as "a perfectly secluded driveway that's covered on all sides."  When MINER suggested that UC-1 could follow them to JOU's driveway to complete the transaction, UC-1 explained that he/she did not have the guns at that time but might be able to meet in a week, depending on what other guns MINER and JOU wanted to purchase and how much they wanted to spend.

17.    JOU stated that he was willing to spend $3,000 and that he was "looking for the—nice, something real nice. You know."  UC-1 stated "everything we have, the one thing we don't need is the government involved, you know what I mean, from the registering to the buying, to tracking, so everything is clean, everything, everything is private, that's why we have to be discreet . . . Especially with online, a lot of guys get into issues . . . Cause then they start seeing like, the amount of stuff you buy."  JOU responded, "If that's what you mean, then I'm gonna start to add on because, you know, I'm seeing stuff that I want every day."  JOU stated that he would add on to his list of firearms before UC-1 returned to complete the gun transaction.

18.     UC-1 stated that he/she did not know exactly what other firearms he/she would be able to provide, that he/she would bring "a couple [of] ARs" for MINER and JOU to examine at their next meeting, which they discussed taking place the following Sunday, May 3, 2020.  MINER asked UC-1 whether he could buy all three guns he wanted – meaning the Smith and Wesson Shield handgun, the Mossberg 500 shotgun and an AR-15 style assault rifle – for $2,000.  UC-1 stated that it was possible.

19.     When MINER and JOU discussed the possibility of purchasing different types of ammunition from UC-1, MINER indicated shotgun rounds are "good home defense." UC-1 stated, "Ok. It's all for home defense? You guys aren't gonna get in trouble, are you?" MINER responded, "Absolutely not…absolutely not dude."  UC-1 responded, "Alright. I don't want that shit coming back on me" and MINER responded, "Hell no. I have a life, I have a girl, I have a job, I have a future, I'm not gonna" at which point JOU interrupted him and stated "my driveway has a basement and that's where I'm gonna store it" and that "we can freely talk in there, ya know?"

20.     During the meeting UC-1 also stated, "alright, really important, so we've been texting, I don't want to say anything over the phone" and MINER responded, "Never, never never."  UC-1 stated "I don't want to put it in text" and MINER asked if UC-1 and JOU were familiar with a specific online communication service that provides encrypted text messaging ("the Encrypted Platform").  UC-1 and JOU indicated their familiarity with the program.  UC-1 then provided his/her Encrypted Platform account name to JOU and MINER for future communications.  MINER and JOU each provided UC-1 with their Encrypted Platform account names.

21.     Toward the end of the conversation, UC-1 stated that he/she would check in about the possibility of bringing ammunition to the next meeting, and again expressed reluctance to do so because of "interstate stuff." MINER stated "I understand. A little would be nice, but if you wanna play it safe that's totally cool too." UC-1 responded, "Okay. Like even just a couple of boxes would be all right?" to which MINER responded, "Yeah, yeah . . ."

22.     At the conclusion of the meeting, MINER stated that they were "eager" and "ready today like I said," and JOU added "We were ready today."

23.     The following day, April 27, 2020, MINER sent UC-1 a text via the Encrypted Platform. MINER wrote:

> So if you could bring the shield, the mossy and that ghost w attachment mentioned, and maybe a few boxes of amm besides. Thatd be awesome. If 2 flat covers it, or if youd like a little more, let me know. Thanks a ton

Based on my knowledge, training and experience, as well as other evidence obtained during this investigation, I believe that MINER was referencing his desire to purchase the three firearms he had previously discussed purchasing from UC-1, as well as ammunition, and that "2 flat" referred to the possibility of purchasing all three weapons and ammunition for $2,000 or a little more.

24.     That same day, April 27, 2020, JOU also contacted UC-1 via text on the Encrypted Platform and specified his desire to purchase multiple firearms. Specifically, JOU asked to "go over the list" and expressed his interest in purchasing an "M92 elite LLT/w trigger

job & Opt. Performance Bar," a "Springfield 1911 TRP"[2] and Glock 19 and Glock 26 handguns. JOU also asked "What is the nicest AR available[?]" UC-1 responded, "So no promises but I should have a colt and a ghost but it seems like your buddy is claiming dibs on the ghost one. The colt is solid." Shortly thereafter, JOU wrote to UC-1 and stated "I looking for a light civilian tactical version." He then followed-up, "lightweight" and "on the higher end." UC-1 responded that he/she would check but that he/she would likely have such an option for JOU to purchase, and asked how much money JOU had "ready." JOU responded, "5k." Based on my knowledge, trainnig and experience, as well as other information obtained during the investigation, I believe the "5k" referred to by JOU was a reference to $5,000. UC-1 responded, "Ok I'll fill up the trunk bro." JOU responded, "Nice. I almost always go with the upgraded version" "unless the options are limited." UC-1 responded, "Demand is through roof but I know you guys serious so I'm hoping to get back there this weekend." JOU then responded "I appreciate you. Especially at a time like this."

    25. On or about April 28, 2020, JOU texted UC-1 via the Encrypted Platform and wrote ".357 desert eagle L5," which based on my knowledge, training and experience is a reference to a Desert Eagle handgun with a 5 inch barrel.

    26. On or about April 29, 2020, MINER texted UC-1 via the Encrypted Platform and wrote "If u can, throw in a p 3 at, for me. Thanks." Based on my knowledge, training and experience, MINER was referring to a Kel Tec model P3AT pistol which, according to the manufacturer's website, "is designed primarily for deep concealment…with a little extra power."

---

   [2] TRP stands for "Tactical Response Pistol," a Springfield model inspired by a model of handgun carried by law enforcement.

27. On or about May 2, 2020, MINER and UC-1 again spoke by phone. The call was recorded. During the call, UC-1 stated he/she would be unable to meet on Sunday, May 3, 2020, as they had discussed, but would try to meet the following weekend. When UC-1 began detailing the specific guns that he had reserved for MINER and JOU, MINER interrupted UC-1 and suggested that UC-1 provide the information over the Encrypted Platform. UC-1 agreed.

28. Shortly thereafter, UC-1 contacted MINER via the Encrypted Platform and wrote "I got on hold for u guys the glock19 for ur friend and the shield and mossberg for u. Serial numbers all cleaned off so they are clear (no trace) and good to go. I will have the ghost AR and some other long ones for u guys. Does that work?" MINER responded "Yes. But next Sun im out of town." UC-1 and MINER then agreed to find a later date to meet. During the exchange, MINER also stated, "Alright man. Tomorrow [referring to Sunday, May 3, 2020] wouldve been perfect! Keep me posted."

29. Shortly thereafter, also on or about May 2, 2020, JOU contacted UC-1 via text message on the Encrypted Platform. UC-1 told JOU "I told ur friend I'm keeping on side a g19 for u with serial cleaned off so no trace and will have some others including some ARs to choose from." UC-1 also told JOU that he/she might be available to meet the following weekend. JOU responded, "Will it be everything I requested or only what u have available." UC-1 "probs not everything bc demand is high but I'll have a box of others that u can pick from." JOU responded, "I understand but would be appreciative if u can locate them I am looking for those models specifically."

30. On or about May 6, 2020, UC-1 and MINER communicated again via the Encrypted Platform and agreed to meet for the gun purchase on Tuesday, May 12, 2020. At UC-1's request, MINER stated that he would let JOU know about the planned meeting.

31. On or about May 7, 2020, JOU contacted UC-1 via the Encrypted Platform and asked "R we looking good for tomorrow" and UC-1 stated that they would be meeting Tuesday evening. JOU confirmed that Tuesday, May 12, 2020, would work for him and then sent several messages via the Encrypted Platform requesting two additional firearms and asking if the guns were available. Specifically, he requested a "CZ-P10S" and "CZ Accu Shadow 2." Based on my knowledge, training and experience, as well as my investigation of this case, both are handguns distributed in the United States by CZ-USA, a wholly-owned subsidiary of the Czech Republic based company Ceska Zbrojovka A.S. Uhersky Brod.

32. On or about May 12, 2020, UC-1 met JOU and MINER in a hotel room in Queens, as they had previously agreed. UC-1 was joined by a second undercover officer ("UC-2"), whom UC-1 explained was there for UC-1's protection.

33. During the meeting, UC-1 offered multiple firearms for sale, including the AR-15 style assault rifle "ghost gun" and the Colt M4 assault rifle that JOU and MINER had previously discussed with UC-1. JOU and MINER each handled and examined several guns during the meeting, and UC-1 and UC-2 pointed out that the serial numbers had been obliterated from many of the firearms. UC-2 also discussed with JOU and MINER the silencer attachments for the AR-15 style assault rifle "ghost gun" and the Colt M4, which JOU and MINER had previously discussed with UC-1. UC-2 also explained how to use the Colt M4 as a fully automatic firearm.

34. After handling and discussing several firearms, JOU paid approximately $1,190 to purchase two firearms: a Glock 19 model 9 millimeter handgun and the fully automatic Colt M4 "Commando" assault rifle with silencer attachment. The Glock 19's serial number was obliterated. JOU also expressed his desire to purchase more firearms from UC-1, including some of the firearms JOU had previously requested from UC-1 over the Encrypted Platform.

35. After handling and discussing several firearms, MINER paid approximately $2,000 cash for the following: a Mossberg 500 shotgun; an M&P Shield model 9 millimeter handgun; and the AR-15 assault style "ghost gun" with a silencer attachment. The serial numbers on both the 9 millimeter Shield and the Mossberg shotgun were obliterated. As set forth above, the "ghost gun" contains no serial numbers.

36. Each of the AR-15 assault style firearms purchased by JOU and MINER contained a high capacity magazine.

37. MINER also paid approximately $100 for approximately 220 rounds of ammunition, which he and JOU indicated they would share between them. Specifically, MINER purchased approximately 100 9 millimeter rounds, 100 .556 caliber rounds and 20 shotgun shells.

38. After purchasing their respective firearms, JOU and MINER each placed their guns in bags, which UC-1 provided at MINER's prior request. JOU and MINER each carried his own bag of firearms as they exited the hotel room, at which point law enforcement officers placed them under arrest.

39. I have conferred with a Nexus expert, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who has informed me that the each of the firearms

purchased by JOU and MINER from UC-1 and UC-2 on or about May 12, 2020, as set forth above, were manufactured outside the state of New York.

WHEREFORE, your deponent respectfully requests that the defendants DANIEL JOU and JOSEPH MINER be dealt with according to law.

_____
NATHAN RUDNICK
Special Agent
Federal Bureau of Investigation

Sworn to before me this
13th day of May, 2020

_____
THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK