

U.S. Department of Justice

United States Attorney
Eastern District of New York

DMP:JGH/JAM
F.#2020R00001

271 Cadman Plaza East
Brooklyn, New York 11201

May 13, 2020

By ECF

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Joseph Miner
                  Magistrate Docket No. 20-368

Dear Judge Levy:

      Later today, defendant Joseph Miner is scheduled to be presented before Your Honor on the above-referenced complaint. For the reasons set forth below, the government respectfully submits that the Court should enter a permanent order of detention because the defendant presents a danger to the community and a risk of flight.[1]

I.     The Offense Conduct

      On May 13, 2020, the government filed a one-count complaint in the Eastern District of New York charging the defendant with receipt and possession of firearms with obliterated serial numbers, in violation of 18 U.S.C. § 922(k). The defendant is a 29-year old American citizen with no adult criminal history.

      During the course of the investigation, which began in late 2019, law enforcement authorities observed postings on Miner's social media accounts and in private

---

[1]     Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents, or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

messages about his desire to obtain assault weapons and other firearms, as well as violent racist and anti-Semitic content.

   A.  Miner's Social Media Activity

For example, Miner posted the following content on Instagram in or about December 2019 and January 2020:

- a photograph of himself giving a Nazi salute with the text: "God I hate women jews and niggers."
- a photograph of himself giving a Nazi salute, displaying a large knife with the text: "overthrowing [Jews] is our Christian duty;"
- in response to a bloody crime scene photograph from the December 2019 machete attack at a synagogue in Monsey, New York, the comment, "ngl [not gonna lie] this is pretty fucking exciting;"
- in response to a post lamenting the recent spate of anti-Semitic attacks in the greater New York City area, the comment "HIEL [sic] HITLER;"
- a photograph of a Planned Parenthood being blown up by the comic book character the Joker;
- an article describing the arrest of a 26-year old Israeli national for cashing a false check, with overlaid text that reads, "Jews must have a genetic devotion to the number six. 666, 6 million, etc."

Even more disconcerting, on or about January 22, 2020, Miner posted a photograph of the entrance to a Jewish Community Center in Queens.

Instagram messages posted in or about and between October 2019 and February 2020 reveal that Miner frequently displayed suicidal ideations and fantasized about "martyring" himself and "go[ing] out in a blaze of glory" in a mass shooting-type of attack. For example, in a series of messages posted on November 4, 2019, Miner considered "go[ing] out firing. Go on a spree after my enemies til the authorities take me out...Sometimes I've considered forming a well trained incel hit squad." In another series of posts from January 3, 2020, Miner stated, "I want to go out shooting the cops...take out a.Bunch [sic] of enemies and die shooting." In a post on February 14, 2020, Miner stated, "Tbh [to be honest] dying fighting Paki and African pieces of shit in Europe wouldn't be the worst way to go. Die a hero."

Miner also frequently discussed obtaining assault weapons and other firearms. In in one November 8, 2019 post, he stated that he sought to do so for "boogaloo purposes," which is slang for a racial civil war in the United States. In another series of posts from November 5, 2019, Miner stated that he hoped for the onset of "RaHoWa," or racial holy war, and contemplated moving to Texas where he can "own [his] guns" without having to "beg police judge and detective for permission…Just for a pistol. Beg on your knees like a

bitch." On November 15, 2019, in an apparent reference to the August 2017 white supremacist rally in Charlottesville, Virginia, Miner stated, "I'm pretty fearless at this point I yearn for the next Cville."

In other messages and statements, Miner minimized his propensity for violence, alternatively claiming that his need for weapons was for self-defense and stating, for example, that he disavowed terrorist attacks and that he was "so tame [he's] no real threat." Nevertheless, on February 7, 2020, Miner lamented, "[s]ome day, I will probably have to shed my blood or go to prison for the things I say and do and stand for."

B. Miner's Attempts to Procure Military Equipment and Weapons

While he was posting the aforementioned content on social media, Miner made efforts to obtain tactical military gear and firearms. For example, financial and other records revealed that, on or about January 17, 2020, Miner purchased body armor emblazoned with an iteration of the Wolfsangel, a Nazi party symbol that, most recently, has been adopted by the Azov Battalion, a Ukrainian militia group.[2] Shortly thereafter, on or about February 4, 2020, Miner called a pawnshop in Texas – where he used to reside – and inquired about purchasing assault weapons and a Mossberg shotgun. Then, on or about March 30, 2020, Miner purchased a tactical ballistic helmet, which is used by military and law enforcement personnel, and posted a photo of it on Instagram.

C. Miner's Firearms Purchase

As described in detail in the complaint, in or about April 2020, Miner was introduced to and had numerous communications with an undercover member of law enforcement ("the UC"). In his text and voice communications with the UC in or about April 2020, Miner used coded language, referring to the firearms he wished to purchase as "tools" or "supplies." Miner also informed the UC that co-defendant Daniel Jou was also interested in purchasing several weapons. As described in the complaint, Miner assured the UC that he and Jou had the money to pay for the items and were ready to complete the purchase, "the sooner the better."

On or about April 26, 2020, Miner and Jou met with the UC in the lobby of a hotel in Queens, New York. This meeting was recorded. During the meeting, Miner stated that he was interested in purchasing two firearms, a Smith and Wesson Shield M2.0 9mm

---

[2] The Azov Battalion is widely regarded as a far-right, ultranationalist group that espouses a neo-Nazi ideology. Foreign fighters from the United States and Europe that have similar white supremacist and extremist views have travelled to the Ukraine to receive combat training and fight with the Azov Battalion.

3

pistol and a Mossberg 500 shotgun.  Jou stated that he wanted to purchase three 9mm semi-automatic pistols, namely, a Beretta M92FS, a Springfield 1911, and a Glock 19.  The three discussed pricing, and both Miner and Jou indicated that they had thousands of dollars in cash on hand and were ready to purchase the weapons that evening.  The UC informed Miner and Jou that he did not presently have the firearms and that a second meeting, possibly the following weekend, needed to be scheduled to finalize the purchase.  Both Miner and Jou expressed interest in buying ammunition from the UC, and Miner indicated that he was interested in buying an assault rifle in the future when he had more money available.  The UC stated that he had several assault rifles available at a price point that Miner could afford, including a "ghost" AR-15 with a "suppressor" attached, as well as large-capacity magazines.[3]

At various points in the conversation, the UC informed both Miner and Jou that, given the illegal nature of the transaction, the "serial numbers" on the weapons had been "cleaned off."  Despite claiming that he needed the weapons for "self-defense," Miner suggested that further communications be conducted over an encrypted internet-based messaging platform and gave the UC his username.  Jou also gave the UC his username. At the conclusion of the meeting, both Miner and Jou reiterated that they were "eager" to buy, had the money, and were "ready today."

The following day, Miner contacted the UC via the aforementioned encrypted messaging platform and confirmed that he wanted to purchase the firearms discussed at the meeting.  Specifically, Miner told the UC to "bring the shield [9mm pistol], the mossy [shotgun] and that ghost w attachment [AR-15 with silencer] you mentioned, and maybe a few boxes of amm besides."  Jou also contacted the UC via the encrypted platform and asked "can we go over the list[?]"  Jou confirmed that he wanted the firearms discussed at the prior meeting, including "1911 9mm and glock 19 [and] M92 elite LLT/w trigger job & Opt. Performance Bar." In subsequent messages, Jou asked about several other handguns, and asked the UC "[w]hat is the nicest AR available," referring to an AR-15 assault rifle.  Miner also asked the UC for an additional firearm, a "p 3 at," referring to a KelTec P3AT semi-automatic pistol.[4]

---

[3]     A "ghost gun" is a firearm that has been assembled from different parts, none of which contain a serial number or identifying markings, thereby making them difficult for law enforcement to trace. A "suppressor," also known as a "silencer," is a muzzle device that reduces the noise and flash when a gun is fired.

[4]     Based on my training and experience, I know that a P3AT pistol is a small weapon, which, according to the manufacturer's website, "is designed primarily for deep concealment…with a little extra power."

4

As described in the complaint, the UC again informed Miner via text that the "serial numbers all cleaned off so they are clear (no trace) and good to go…I will have the ghost AR and some other long guns for u guys." The UC repeated a similar disclaimer to Jou, noting that the "serial" had been "cleaned off [the firearms] so no trace."

On May 12, 2020, Miner and Jou met the UC and a second undercover officer at the same hotel in Queens, New York to consummate the deal. Miner purchased an AR-15-style ghost gun with a silencer, a Mossberg 500 shotgun, and an M&P "Shield" model 9 mm semi-automatic pistol. The shotgun and the pistol had their serial numbers obliterated. Jou purchased a fully automatic Colt M4 assault rifle, which was also equipped with a silencer, and a Glock 19 9 mm semi-automatic pistol that had its serial number obliterated. The two also purchased ammunition and high-capacity magazines for their respective assault weapons.

II.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, including whether the offense is a "crime of violence"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

The Second Circuit has held that crimes involving the mere possession of firearms are inherently dangerous and constitute crimes of violence under the Bail Reform Act. United States v. Dillard, 214 F.3d 88, 96 (2d Cir. 2000). In Dillard, the Second Circuit observed that:

> Firearms are instruments designed for the use of violent physical force, whether legal or illegal. Apart from use for target practice in sport, firearms have no functional utility other than to threaten or cause harm to persons, animals, or property…

5

> [F]irearms are conventionally regarded as essential equipment
> of criminals engaged in violent crime.

214 F.3d at 93. Dillard also recognized that silencers are "conventionally regarded as…equipment of criminals engaged in violent crime." Id. In applying Dillard, district courts have found that 18 U.S.C. § 922(k) qualifies as crime of violence under the Bail Reform Act. See, e.g., United States v. Munlyn, 607 F. Supp. 2d 394, 399 (E.D.N.Y. 2009) ("possession of a gun by its nature gives rise to a risk of its use in violence"); United States v. Escobar-Gonzalez, 05-CR-063 (GAG), 2005 WL 459643 at *1 (D.P.R. 2005).

As discussed below, the Bail Reform Act factors weigh heavily against pretrial release.

### III. The Court Should Enter a Permanent Order of Detention

The factors to be considered in the detention analysis show that Miner presents both a significant danger to the community and a substantial risk of flight if released on bond. Accordingly, the Court should enter a permanent order of detention pending trial.

#### A. The Nature and Circumstances of the Offense Charged and the Danger to the Community Posed by Release

The charged offense is serious, and the circumstances surrounding the charges are even more so. These considerations demonstrate that the defendant is an acute danger to the community if released.

With respect to the offense charged in the complaint, the defendant purchased a shotgun and semi-automatic pistol with obliterated serial numbers, a "ghost" assault weapon with a silencer, and a high-capacity magazine with ammunition. The defendant's communications with undercover officers make clear that he was well aware that the serial numbers had been removed and the purpose for doing so: to anonymize the weapon, its illicit source and its end user. Similarly, the defendant's interest in purchasing a silencer reflected his desire to use the weapons without being detected. United States v. Dodge, 846 F. Supp. 181 (D.Conn 1994) (noting that a silencer is "inherently dangerous…for which no peaceful purpose can be seriously suggested, regardless of whether the weapons actually are used"). As such, "the mere possession of such weapons…presents a substantial risk of physical injury to others." Id. (citing United States v. Ballantine, 4 F.3d 504, 507 (7th Cir. 1993) and United States v. Horodner, 993 F.2d 191, 193 (9th Cir. 1993) and noting that possession of a firearm is a continuing offense where the "risk of harm to others remain[s] present throughout their commission"). Thus, Miner's possession of these items – standing alone – provides clear and convincing proof that he should be detained pending trial. See United States v. Rivera, 95-CR-198 (FB), 1995 WL 302456 (E.D.N.Y. April 28, 1995) (seizure of a loaded, defaced pistol, a .22 caliber revolver, two silencers, assorted clips and ammunition,

and drug paraphernalia from defendant's residence established by clear and convincing evidence that there is a serious risk that the release of defendant would endanger the safety of another person or the community).

Miner's statement to the UC that he ostensibly sought these weapons for "self-defense" is belied by the number and nature of the weapons he purchased, as well as the context in which he purchased them. As described in the complaint, Miner actively and repeatedly solicited the UC – whom he believed to be an illegal firearms trafficker – to purchase these weapons, rather than acquiring them through lawful channels. Relatedly, it defies common sense why Miner would need multiple firearms, one being an untraceable "ghost" assault weapon with a silencer, for defensive purposes. See Escobar-Gonzalez, 05-CR-063 (GAG), 2005 WL 459643 at *2 (D.P.R. 2005) (following Dillard and finding that, "[a] conglomerate of such illegal lethal weapons and paraphernalia can only suggest that their possessor (the defendant) intended to use them, along with other persons, to commit a dangerous and deadly act…[s]imply put, this Court cannot fathom any legitimate, non-violent use for these weapons.").

The fact that Miner readily attempted to assist his co-defendant in acquiring a similar stockpile of weapons and ammunition is a further aggravating factor militating towards Miner's detention.

Beyond this, as described herein, the evidence uncovered during the investigation has revealed that Miner has embraced an extremely violent ideology and contemplated committing acts of terrorism. In his own social media postings, he has glorified acts of murder and terrorism against racial, ethnic and religious groups. More ominously, he has ruminated about engaging in such violent conduct himself. While the government is not aware of whether Miner was actively planning any mass attack or other criminal plot, the fact that he purchased body armor and a tactical helmet prior to the instant offense conduct must necessarily give the Court pause when considering his release, even under the strictest of bail conditions.

In sum, Miner presents a grave danger to the community that no set of release conditions can mitigate.

B. The Weight of the Evidence

The weight of the evidence in this case is overwhelming. The defendant was caught on video and audio surveillance buying and receiving the firearms with obliterated serial numbers. Moreover, the defendant's multiple meetings and communications with the UC, which are summarized extensively in the complaint, are recorded on audio and/or video surveillance, as well as being preserved in text messages. Even prior to his interaction with the UC, the defendant made inquiries about purchasing assault weapons and other firearms at

a pawnshop. His predisposition and willingness to commit the charged offenses is beyond question. As such, the strength of the case against the defendant gives him a significant motive to flee rather than be convicted at trial. See 18 U.S.C. § 924(a)(1)(B).

    C.    The Defendant's History and Characteristics

The defendant's history and characteristics confirm he presents a substantial risk of flight and danger to the community. As noted above, the defendant has expressed violent extremist views and has praised hate crimes and acts of terrorism within the greater New York City area. Although he has ties to this district – he lives with his parents in Queens – the government is not aware of any other significant relationships that the defendant has that might mitigate against an incentive to flee or to engage in conduct dangerous to the community.

IV.    Conclusion

For all of the foregoing reasons, the defendant should be detained pending trial. The defendant is charged with a serious offense, and the facts surrounding his conduct suggest the defendant's willingness to commit even more serious crimes. The government respectfully submits that no condition or combination of conditions will assure the safety of the community, the defendant's return to court, or his compliance with the Court's directives, and the Court should thus enter a permanent order of detention pending trial.

    Respectfully submitted,

    RICHARD P. DONOGHUE
    United States Attorney

By:    /s/ Josh Hafetz
    Josh Hafetz
    Artie McConnell
    Assistant U.S. Attorneys
    (718) 254-7000

cc:    Clerk of Court (by ECF)